# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| U.S. WOMEN'S CHAMBER OF COMMERCE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No.: 1:04-CV-01889 |
| (RBW) | |
| U.S. SMALL BUSINESS ADMINISTRATION, | ) |
| HECTOR V. BARRETO, Administrator, | ) |
| U.S. Small Business Administration | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

## MEMORANDUM OPINION

Plaintiff U.S. Women's Chamber of Commerce ("Women's Chamber of Commerce")[1]

brought this lawsuit pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(1)

(2000), and the All Writs Act, 28 U.S.C. § 1651(a) (2000), seeking an order or writ of mandamus

compelling the defendants, the U.S. Small Business Administration ("SBA") and its

Administrator, to complete their obligations mandated by the Equity in Contracting for Women

Act of 2000 ("Women's Act"), codified at 15 U.S.C. § 637(m) (2000), within three months.

Complaint ("Compl.") at 11. The plaintiff contends that the SBA has violated § 555(b) of the

APA, 5 U.S.C. § 555(b) (2000), by failing, "within reasonable time," to complete a study and

establishing procedures to identify underrepresented Women Owned Small Businesses

("WOSBs") in the area of federal procurement contracting. Id. ¶ 32. The plaintiff also claims

that the issuance of a writ of mandamus "is necessary in aid of this Court's jurisdiction to ensure

---

[1] According to the plaintiff, "[t]he Chamber's membership consists of 150,000 individuals, business owners, career professionals, women's organizations, economic development organizations and leadership organizations." Compl. ¶ 3.

that the defendants fulfill their duty under the APA."  Id. ¶ 33.  Currently before the Court is the

Defendants' Motion to Dismiss ("Defs.' Mot.") (D.E. # 11) pursuant to Federal Rule of Civil

Procedure 12(b)(1), on the ground that this Court does not have subject matter jurisdiction to

hear this case.  For the reasons set forth below, the defendants' motion is denied.

## I. Background

### A.      Statutory Background

The Women's Act was signed into law on December 21, 2000, to allow for greater

representation of WOSBs in certain historically underrepresented industries in federal

contracting.  Pub. L. No. 106-554, 114 Stat. 2763A-708 (2000) (codified, as amended, at 15

U.S.C. § 637(m)).  The Women's Act is an amendment to the Small Business Act, 15 U.S.C. §§

631 et seq. (2000), which was added as part of the Small Business Reauthorization Act of 2000.

See H.R. 5667, 106th Cong. § 811 (2000).[2]  Under the Women's Act, the federal contracting

officer, in this case the SBA,[3] is required to establish a preferential procurement program for

"small business concerns owned and controlled by women."  15 U.S.C. § 637(m)(2).[4]  The Act

---

[2]  A similar program was previously enacted for the SBA to award federal contracts to those "small
business concern[s] owned and controlled by socially and economically disadvantaged individuals" and gives the
Administrator the power to award such contracts "whenever it determines such action is necessary or appropriate."
15 U.S.C. § 637(a)(1)(C).

[3]  The Act defines "contracting officer" in accordance with 41 U.S.C. § 423(f)(5) (2000).  "The term
'contracting officer' means a person who, by appointment in accordance with applicable regulations, has the
authority to enter into a Federal agency procurement contract on behalf of the Government and to make
determinations and findings with respect to such a contract."  41 U.S.C. § 423(f)(5).

[4]         [A] small business concern is a small business concern owned and controlled by women
            if—
               (1) at least 51 percent of small business concern is owned by one or more women or,
            in the case of any publicly owned business, at least 51 percent of the stock of which is
            owned by one or more women; and
               (2) the management and daily business operations of the business are controlled by one

(continued...)

provides, in part, that:

> a contracting officer may restrict competition for any contract for the procurement of goods or services by the Federal Government to small business concerns owned and controlled by women, if–
>
> (A) each of the concerns is not less than 51 percent owned by one or more women who are economically disadvantaged (and such ownership is determined without regard to any community property law);
>
> (B) the contracting officer has a reasonable expectation that two or more small business concerns owned and controlled by women will submit offers for the contract;
>
> (C) the contract is for the procurement of goods or services with respect to an industry identified by the Administrator pursuant to paragraph (3);[5]
>
> (D) the anticipated award price of the contract (including options) does not exceed–
>
> (i) $5,000,000, in the case of a contract assigned an industrial classification code for manufacturing; or
>
> (ii) $3,000,000, in the case of all other contracts;
>
> (E) in the estimation of the contracting officer, the contract award can be made at a fair and reasonable price; and
>
> (F) each of the concerns--
>
> (i) is certified by a Federal agency, a State government, or a national certifying entity approved by the Administrator, as a small business concern owned and controlled by women; or
>
> (ii) certifies to the contracting officer that it is a small business concern owned and controlled by women and provides adequate documentation, in accordance with standards established by the Administration, to support such certification.

15 U.S.C. § 637(m)(2).  To implement the program, Administrator must first identify the types of industries that will benefit from the Women's Act.  See 15 U.S.C. § 637(m)(2)(C).  Thus, to qualify under the Act, an industry must be identified by the SBA, which is Congressionally

---

[4](...continued)
or more women.
15 U.S.C. § 632(n) (2000).  However, "ownership [of a small businesses concern] shall be determined without regard to any community property law."  15 U.S.C. § 637(m)(1)(B).

[5] Congress apparently made a clerical error when it referred to paragraph three rather than four.  Compl. ¶ 12.  Paragraph (3) is a waiver provision, which allows the Administrator to waive the requirements of 15 U.S.C. § 637(m)(2)(A) (that the WOSBs must be "economically disadvantaged") if the Administrator determines that the WOSBs is "substantially underrepresented."  15 U.S.C. § 637(m)(3).  Paragraph four is entitled "[i]dentification of industries."  15 U.S.C. § 637(m)(4).

mandated to "conduct a study to identify industries in which small business concerns owned and

controlled by women are underrepresented with respect to Federal procurement contracting."  15

U.S.C. § 637(m)(4).  The dispute in this case turns on whether the SBA's delay in completing the

mandated study and establishing procedures to verify the eligibility of WOSBs to participate in

the women's procurement program violates the APA because the delay is unreasonable.  Compl.

¶ 32.

## B.    Factual Background

According to the plaintiff, although almost four years has elapsed since the Women's Act

was enacted, the SBA has failed to fulfil its obligations to complete the study and adopt the

procedures required by the Women's Act despite having set two deadlines for the

implementation of the Act.[6]  Id. ¶¶ 2, 15.[7]  A draft study and proposed procedures were

completed in September 2001, however, neither were ever published.[8]  Id. ¶ 16.  The SBA

submitted the proposed regulations to the Office of Management and Budget ("OMB"), which is

the agency required by law to review all draft regulations before publication within ninety days of

---

[6]  The Women's Chamber of Commerce explains that the SBA set the following two deadlines: The first was set in response to questions submitted to the SBA after the completion of Regulatory Fairness hearings that were sponsored by SBA's Office of the National Ombusman and held at various times throughout the country.  Compl. ¶ 15; see Defs.' Mot., Ex. A (Declaration of Hector V. Barreto, January 14, 2005 ("Barreto Decl.")) ¶ 3 and Ex. B (Declaration of Michael L. Barrera, January 13, 2005 ("Barrera Decl.")) ¶ 3 for a description for these hearings.  The Women's Chamber of Commerce alleges that in response to its May 16, 2001 inquiry, the Administrator estimated a completion date of "late summer" of 2001 and this date was later changed to a completion date at the end of 2001.  Compl. ¶ 15.  However, the SBA failed to meet both deadlines.  Id.

[7]  According to the plaintiff, the SBA claimed that "as part of the implementation efforts, changes to the Federal Aquisition Regulation ("FAR") and the Code of Federal Regulations ("CFR") [would] include definitions of economically disadvantaged, underrepresented, and 'substantially underrepresented' WOSBs and [would] specify the process for certification, waivers, etc . . . by the end of 2001" but it has failed to publish anything.  Compl. ¶ 15.

[8]  The regulations refer to a "study," 15 U.S.C. § 637(m)(4),  as well as "procedures" that allow for enforcement and "the verification of eligibility" in the WOSBs program.  Id. § 637(m)(5).  This Court will use the term "regulations" when referring to both the study and procedures under the Women's Act.

their submission to the OMB.  Id. ¶ 17.  However, the SBA withdrew the regulations before the

review was complete, id., Semiannual Regulatory Agenda, 67 Fed. Reg. 34,004 (May 13, 2002)

(to be codified at 13 C.F.R. ch.1), because the Administrator had concerns about the content and

constitutionality of its draft industry study and believed that it needed to contract with the

National Academy of Science ("NAS") to review the draft industry study and recommend any

changes the NAS believed were necessary.  Compl. ¶ 21; Memorandum of Points and Authorities

in Support of Defendants' Motion to Dismiss ("Defs.' Mem.") at 12.  The SBA then awarded a

contract to the NAS in late 2003 to examine the statistical accuracy of the study and to offer

recommendations.  Compl. ¶¶ 21, 23;  Defs.' Mem. at 11-13.[9]  This NAS review had not been

complete when the plaintiff filed its complaint with this Court.[10]  The NAS ultimately completed

its review and issued a report on the draft study on March 11, 2005.  Notice Re: Issuance of

Report by the National Academy of Sciences ("Defs.' Notice of Report") at 1.  The report found

that the draft study was inadequate to identify underrepresented WOSBs in the federal

contracting process and should not be used as a basis for identifying "industries in which to

permit the use of preferential contracting programs."  Id. at 1-2 (quoting NAS Report, Executive

Summary at ES-1).  To date, the published study and the adoption of the procedures required by

the Women's Act have not been completed.[11]

_____

[9]  Under the Women's Act, the Administrator is permitted to contract with outside parties in order to "provide to the Administrator such information as the Administrator determines to be necessary to carry out this subsection." 15 U.S.C. § 637(m)(6).

[10]  The complaint was filed October 29, 2004.  The original completion date for the NAS review of the draft study was set for the spring of 2004, however, the NAS requested an extension of time from the SBA and received the extension for an estimated completion date in late fall of 2004.  Compl. ¶ 24.

[11]  On September 16, 2005, this Court issued an order requiring the defendants to submit a status report on the draft study in light of the NAS determination that their drafts were inadequate.  The defendants submitted that

(continued...)

## II.  Standard of Review

In an action brought under the APA, this Court will grant a motion to dismiss for lack of subject matter jurisdiction if a plaintiff fails to meet either the constitutional or prudential requirements of standing.  Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co., 522 U.S. 479, 488 (1998).  Article III of the federal Constitution extends judicial power to courts only in situations involving "Cases" and "Controversies."  U.S. Const. art. III, §2.  This limitation has been interpreted by the courts to include the requirement that a plaintiff must have standing to pursue a court action in federal court.  Nat'l Treasury Employees Union (NTEU) v. United States, 101 F.3d 1423, 1427 (D.C. Cir. 1996) (citations omitted).  And

> Article III standing requires that a plaintiff have suffered an (1) 'injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent not conjectural or hypothetical' – (2) which is 'fairly traceable' to the challenged act, and (3) 'likely' to be redressed by a favorable decision.

Id. (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).  The plaintiff in an APA case must also meet the prudential requirements of standing imposed by § 10(a) of the APA, 5 U.S.C. § 702, which requires that the plaintiff's interest "[must be] arguably within the zone of interests to be protected or regulated by the statute . . . in question."  Nat'l Credit Union Admin., 522 U.S. at 488 (alteration in original) (quoting Ass'n  of Data Processing Serv. Org., Inc., v. Camp, 397 U.S. 150, 153 (1970)).

When considering a Rule 12(b)(1) motion to dismiss, "courts must accept as true all

---

[11](...continued)
status report to the Court on September 26, 2005, and attached to it the Declaration of Allegra F. McCullough, who is the Associate Deputy Administrator for Government Contracts and Business Development at the SBA.  Notice of Filing of Defendants' Status Report ("Defs.' Status Rept."); Declaration of Allegra F. McCullough (McCullough Decl.) ¶ 1.

material allegations of the complaint and must construe the complaint in favor of the

complaining party." Warth v. Seldin, 422 U.S. 490, 501 (1975).  Thus, "general factual

allegations of injury resulting from [a] defendant's conduct may suffice," and this Court must

"presume that general allegations embrace those specific facts that are necessary to support the

claim." Lujan, 504 U.S. at 561.  However, "[t]he party invoking federal jurisdiction bears the

burden of establishing these [standing] elements," id. (citations omitted), by a preponderance of

the evidence.  Thompson v. Capitol Police, 120 F. Supp. 2d 78, 81 (D.D.C. 2000) (citation

omitted).  To assess whether this burden has been satisfied, courts must sometimes look "beyond

the pleadings."  Phoenix Consulting, Inc. v. Republic of Angl., 216 F.3d 36, 40 (D.C. Cir. 2000);

Thompson, 120 F. Supp. 2d at 81-82 (citation omitted); Uberoi v. EEOC, 180 F. Supp. 2d 42, 44

(D.D.C. 2001) (citation omitted).  Thus, "'[t]he court may consider such materials outside the

pleadings as it deems appropriate to resolve the question whether it has jurisdiction in the case.'"

Uberoi, 180 F. Supp. 2d at 44 (alteration in original) (quoting Scolaro v. D.C. Bd. of Elections

and Ethics, 104 F. Supp. 2d 18, 22 (D.D.C. 2000)).

### III.  The Parties' Position

The Women's Chamber of Commerce has brought this lawsuit alleging that the

defendants have failed to conduct a mandated study and promulgate procedures to identify

WOSBs that are underrepresented in federal contracting in violation of 5 U.S.C. § 555(b).

Compl. ¶ 32.  It contends that the defendants' unreasonable delay in taking action requires

judicial intervention pursuant to 5 U.S.C. § 706(1), which provides that "[t]he reviewing court

shall . . . compel agency action unlawfully withheld or unreasonably delayed." Id. ¶ 11.  To force

the defendant to publish the final study and procedures, the plaintiff has filed this action.

In their motion to dismiss, the defendants assert that the plaintiff is not entitled to any relief because they do not have standing to pursue this action, and in any event, are not entitled to injunctive or mandamus relief.  See Defs.' Mot. at 1.  Specifically, the defendants argue that the plaintiff lacks associational standing because "such a claim by any women-owned small business would be inherently speculative" since not all WOSBs will benefit from the Women's Act and the industries that will benefit have yet to be identified.  Defs.' Mem. at 7.  As further support for their standing challenge, the defendants note that even qualifying businesses will not necessarily be awarded contracts because the contract process will be competitive.  Id.  Indeed, although the Women's Act envisions circumstances where competition can be restricted when the statute is applicable, 15 U.S.C. 637(m)(2), some competition among "small business concerns owned and controlled by women" remains.[12]  The SBA also claims the plaintiff does not have standing under Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982), because there is no direct conflict between the organization's purpose and the "defendants' delay in implementing the WOSB[s] contracting program."  Defs.' Reply at 4-5.

Because the specific relief requested by the plaintiff is "properly characterized as being in the nature of a mandatory injunction," the defendants contend that this Court lacks subject matter jurisdiction because the Court is precluded from granting such relief pursuant to a provision in the Small Business Act, 15 U.S.C. § 634(b)(1) (2000), which prohibits the issuance of injunctions against the Administrator.[13]  Defs.' Mem. at 9.  The defendants concede that the

---

[12]  Specifically, the Women's Act states, in part, that competition may be restricted as long as "the contracting officer has a reasonable expectation that two or more small business concerns owned and controlled by women will submit offers for the contract[.]"  Id. § 637(m)(2)(B)

[13]  The Act provides in, pertinent part, that "the Administrator may . . . be sued in . . . any United States

(continued...)

District of Columbia Circuit permits the SBA Administrator to be sued when he exceeds his authority.  Defs.' Mem. at 11 (quoting <u>Valley Forge Flag Co., Inc. v. Kleppe</u>, 506 F.2d 243, 245 (D.C. Cir. 1974)).  They take exception, however, with the plaintiff's position that  comments made by Administrator Barreto on September 29, 2004, entitle the plaintiff to injunctive relief because those statements demonstrate that Barreto "is acting in excess of his authority by deliberately thwarting the expressed will of Congress."  Defs.' Mem. at 11.  The defendants argue that "[w]hen viewed in its entirety and context . . . those statements show . . . that [the] SBA is working to insure that the WOSB[s] contracting program will be implemented in a way that conforms with the United States Constitution, something which is clearly within the scope of the Administrator's authority."  <u>Id.</u> at 12.  According to the defendants, the proper reading of the statement reveals that Administrator Barreto was stating that the SBA "would not implement the program on the basis of a draft study that would not withstand legal scrutiny, not that [the SBA] would never implement the program."  Barrera Decl. ¶ 7.  This interpretation is allegedly supported by the declaration of Michael L. Barrera, who was also present at the September 29, 2004 hearing.[14]  <u>Id.</u>

In sum, the defendants contend that applying established precedent of the District of Columbia Circuit requires the conclusion that defendants' delay is not unreasonable.  Defs.' Mem. at 13-18.  Accordingly, the defendants conclude that the complaint should be dismissed for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) due to

---

[13](...continued)
District Court . . . but no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the Administrator or his property."  15 U.S.C. § 634(b)(1).
       [14]  Michael L. Barrera is the National Ombudsman in the Office of the National Ombudsman of the SBA.  Barrera Decl. ¶ 1.

plaintiff's standing deficiency and because the relief requested by the plaintiff is barred by 15 U.S.C. 634(b)(1), which as indicated, precludes the issuance of an injunction against the SBA Administrator.  Defs.' Mot. at 1.

In opposition, the plaintiff claims that it has both organizational and associational standing and that the Small Business Act's no-injunction provision does not apply in this case. Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss ("Pl.'s Opp'n") at 2. As evidence of the unreasonableness of the defendants' delay, the plaintiff notes the absence of any funding requests for the Women's Act by the SBA in fiscal year 2003 or 2005, Compl. ¶¶ 19, 25, and the Administrator's failure to respond to a letter sent to him by the House of Representative's Committee on Small Businesses inquiring about the delay.  Id. ¶ 20.[15]  In response to the defendants' argument that injunctive relief is not available against the SBA Administrator, the plaintiff disagrees with the defendants' interpretation of Administrator Barreto's September 29, 2004 comments.  According to the plaintiff, Barreto "indicated that the goals in the Act were meaningless and stated that there were no consequences if the SBA failed to meet the goals" and it "ha[d] no intention of implementing th[e] program."  Id. ¶ 27.  The plaintiff contends that these declarations are evidence of the defendants' intent to ignore the mandates of the Act.  Pl.'s Opp'n, Ex. A (Declaration of Margot Dorfman, February 8, 2005 ("Dorfman Decl.")) ¶ 7.[15]  Thus, the plaintiff argues that it should be award injunctive relief despite the anti-injunction proscription of 15 U.S.C. § 634(b)(1).  Pl.'s Opp'n at 23.

---

[15]   The plaintiff claims that both the House and Senate are "[f]rustrated with the lack of progress in implementing the women's procurement program" and introduced legislation to "make the program self-executing." However, no such legislation has been enacted.  Id. ¶ 22.

[15]   Margot Dorfman is the Chief Executive Officer of the Women's Chamber of Commerce.  Dorfman Decl. ¶ 1.

According to the plaintiff, it has organizational standing because the delay in implementing the Women's Act has frustrated its objectives by causing it to "divert and expend considerable resources advocating that the SBA implement what Congress long ago required, instead of assisting its members in bidding on contracts under the new WOSB[s] program." Id. at 9.  In addition, the plaintiff claims that it has associational standing because it represents individual and small business members that have suffered injuries in fact as a result of defendants' inaction.  Id. at 12.

Because the parties do not dispute that the plaintiff satisfies §10 of the APA, 5 U.S.C. § 702, which imposes a prudential standing requirement in addition to the requirement there be  an injury-in-fact sustained by the plaintiff, this Court need only assess whether the plaintiff has established that it has Article III standing.  Id. at 11; see Nat'l Credit Union Admin., 522 U.S. at 488 n. 4 (examining only prudential standing because there was no dispute over whether the respondent had satisfied an injury-in-fact); see also Fla Audubon Soc'y v. Bentsen, 94 F.3d 658, 665 (D.C. Cir. 1996) (en banc) (declining to review whether the injury was the type "'specifically designed'" to be protected by the National Environmental Policy Act because the appellee only challenged "the traditional components of standing.")

## IV.  Legal Analysis

### A.      Organizational Standing

For an organization to have standing in its own right it must meet the requirements of individual standing, i.e., "[h]as the plaintiff 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction."  Havens Realty Corp.,

455 U.S. at 378-79 (citations and footnote omitted).  As previously stated, to have standing under

Article III of the Constitution, U.S. Const. art. III., a plaintiff must "have suffered (1) 'injury in

fact – an invasion of a legally protected interest which is (a) concrete and particularized and (b)

actual and imminent, not conjectural or hypothetical' – (2) which is 'fairly traceable' to the

challenged act, and (3) 'likely' to be 'redressed by a favorable decision.'"  NTEU, 101 F. 3d at

1427 (quoting Lujan, 504 U.S. at 560).  "With respect to the 'injury in fact' requirement, an

organization suing on its own behalf must demonstrate that it has suffered 'concrete and

demonstrable injury to [its] activity.'"  Id. (quoting Havens Realty Corp., 455 U.S. at 379).  Here,

the plaintiff claims that it has been injured by the SBA's delay in implementing the Women's

Act because it "was founded for the express purpose of assisting WOSBs in obtaining federal

procurement contracts" and that its effectiveness in assisting "members in pursuing opportunities

mandated by Congress" has been diminished as a result of its need to "divert and expend

considerable resources advocating that the SBA implement what Congress long ago required."

Pl.'s Opp'n at 9 (citation omitted).  However, "[f]rustration of an organization's objectives is the

type of abstract concern that does not impart standing."  NTEU, 101 F.3d at 1427.  For

organizational standing to exist, there must be "more than simply a setback to the organization's

abstract societal interests."  Havens Realty Corp., 455 U.S. at 379.  Rather, the defendant's

illegal action must be "'at loggerheads with' and 'squarely counter[] [to] the plaintiff['s]

organizational objective.'"  NTEU, 101 F.3d at 1426 (citation omitted).  As the defendants

accurately note, the plaintiff's goal of assisting WOSBs in obtaining federal procurement

contracts can be accomplished in numerous ways currently available to it that are not depend on

the implementation of the WOSBs contracting program.  Defendant's Reply Memorandum

("Defs.' Reply") at 5 (citing as an example 15 U.S.C. § 644(g)(1)); see also Pl.'s Opp'n at 9.

Thus, the plaintiff has not "alleged inhibition of [its] daily operation" sufficient to demonstrate

an injury-in-fact for organizational standing purposes.  Action Alliance of Senior Citizens of

Greater Phila. v. Heckler, 789 F. 2d 931, 938 (D.C. Cir. 1986).

     Nonetheless, the plaintiff claims that both Havens Realty and  Heckler support a finding

of organizational standing in this case.  Pl.'s Opp'n at 9-10.  However, these cases are

distinguishable from the present case because both involved organizations which suffered

concrete injury due to their inability to provide a service to their members.  See Havens Realty

Corp., 455 U.S. at 379; Heckler, 789 F. 2d at 935.  In Havens Realty, the Court held that the

defendant's "racial steering" violated the Fair Housing Act of 1968, 42 U.S.C. § 3604,  and

interfered with the fair housing organization's "ability to provide counseling and referral services

for low-and moderate-income home-seekers."  455 U.S. at 379-80.[16]  And in Heckler, the

plaintiff (Action Alliance) was a group of organizations "that endeavor[ed], through

informational, counseling, referral, and other services, to improve the lives of elderly citizens."

789 F.2d at 935.  There, the Court found that Action Alliance's ability to provide these services

were curtailed by the Age Discrimination Act, which denied them access to information and

avenues of redress to address their clients needs.  Id. at 937.

     Here, the plaintiff claims that the defendants' inaction has struck "at the heart of" its

"express purpose of assisting WOSBs in obtaining federal procurement contracts by

"diminishing its effectiveness in assisting members in pursuing opportunities mandated by

---

[16]  Racial steering was defined by the plaintiff as "a practice by which real estate brokers and agents preserve and encourage patterns of racial segregation in available housing by steering members of racial and ethnic groups to buildings occupied by members of such racial and ethnic groups and away from buildings and neighborhoods inhabited primarily by members of other races or groups."  Id. at 366 n. 1.

Congress." Pl.'s Opp'n at 9.  The plaintiff, however, has not demonstrated that the services it

provides to its members is similar to those provided in either <u>Havens Realty</u> or <u>Heckler</u>, or that

the defendants' inactions serve as an "inhibition of their daily operations," such that it constitutes

a direct barrier to their ability to provide those services.[17]  Instead, their claim is similar to the

situation in <u>Ctr. for Law and Educ. v. Dep't of Educ.</u>, 396 F. 3d 1152 (D.C. Cir. 2005), where

advocacy groups claimed organizational standing to challenge a provision of the No Child Left

Behind Act, 20 U.S.C. §§ 6301 <u>et seq.</u> (2000), which caused them to change their lobbying

activities and expend money challenging that provision on behalf of its members.  <u>Id.</u> at 1161.

Concluding that the organizational plaintiffs lacked standing to assert a violation of a procedural

right, the District of Columbia Circuit held that "the procedures at issue were not designed to

protect 'some concrete interest of' <u>the organizations</u>."  <u>Id.</u> at 1157 (emphasis in original).

Additionally, as far as the organizations' non-procedural injuries were concerned, the Circuit

Court noted that "'[c]onflict between a defendant's conduct and an organization's mission is

alone insufficient to establish Article III standing."  <u>Id.</u> at 1161 (quoting <u>NTEU</u>, 101 F.3d at

1429).  Similarly, in this case, the plaintiff has "expended considerable financial and human

resources . . . testifying at SBA and other public meetings . . ., writing to and meeting with SBA

officials . . . [, and] responding to requests from its members for information on the status of the

program."  Pl.'s Opp'n at 10.   The District of Columbia Circuit has held that lobbying activities

such as these are "pure issue-advocacy – the very type of activity distinguished by <u>Havens</u>

<u>[Realty]</u>," and the injury that stems from an organization's lobbying activity is insufficient to

---

[17]   The plaintiff's stated mission is to "develop leaders, accelerate economic growth and promote economic
opportunity for women small business owners in federal contracting" through various means.  <u>See</u> Compl. ¶ 3.  It
also "represents the interest of its members in significant and substantial matters before Congress, the Executive
Branch, and independent agencies."  <u>Id.</u>

impart standing.   Ctr. for Law and Educ. 396 F.3d at 1162 (citing Havens Realty Corp., 455 U.S.

363 at 379).  As indicated above, the plaintiff asserts that it has been required to "divert and

expend considerable resources advocating that the SBA implement what Congress long ago

required."  Pl.'s Opp'n at 9.  However, the fact that the plaintiff has expended time lobbying for

their members and incurred expenses doing so was the plaintiff's "own budgetary choice[]."  See

NTEU, 101 F. 3d at 1429 (quoting Fair Employment Council of Greater Wash., Inc. v. BMC

Mktg. Corp., 28 F. 3d 1268, 1277 (D.C. Cir. 1994)).  Therefore, because plaintiff has not shown

that it provides services that are in direct conflict with the defendants' obligations under the Act,

this Court finds that plaintiff does not have organizational standing.

**B.**      **Associational Standing**

        The Supreme Court has stated that "an association may have standing to assert the claims

of its members even where it has suffered no injury from the challenged activity."  Hunt v. Wash.

State Apple Adver. Comm'n 432 U.S. 333, 342 (1977) (citations omitted).  Thus, the Women's

Chamber of Commerce has associational standing to sue on behalf of its members if: "(a) its

members would otherwise have standing to sue in their own right; (b) the interests it seeks to

protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief

requested requires the participation of individual members in the lawsuit."  Id. at 343.  The

defendants challenge only the existence of the first of these three elements. Defs.' Mem. at 6.

        The defendants initially claim that the plaintiff's associational standing argument should

be "instantly fatal" because the plaintiff has not identified any of its members who have failed to

gain federal contracts because the WOSBs procurement program has not been implemented.  Id.

at 7.  However, to satisfy the traceability prong of standing, the plaintiff must only prove that if

not for defendants unreasonable delay in complying with the mandates of the Women's Act, "it reasonably could be inferred that" had the defendants conducted the study and adopted the procedures called for by the Women's Act "there is a substantial probability" that one of its members would have benefitted.  See Warth v. Seldin, 422 U.S. 490, 504 (1975).  The defendants assert that no such showing has been made.  Defs.' Reply at 7.  According to the defendants, the plaintiff cannot make this showing because establishing the benefit requirement in this case is "inherently speculative" since it is impossible to assess eligibility to participate in the WOSBs contracting program at this time as eligibility standards for participation in the program have not yet been established.  Id.  Moreover, argues the defendant, there is no guarantee that even eligible companies would have benefitted from the program's implementation since "contracting opportunities will be subject to competitive bidding."  Id. (citing 15 U.S.C. § 637(m)).

In response, the plaintiff asserts that the defendants' position "impose[s] a 'catch-22': illegally refusing to implement the mandates of the Act, while claiming that its refusal to implement the Act insulates its actions from review."  Pl.'s Opp'n at 14.  This Court agrees and declines to adopt the defendants' circular reasoning as justification for denying the plaintiff standing in this case.  With the circumstances as they now exist, the defendants would have the Court buy-in on the proposition that the plaintiff is unable to show that there is a substantial probability that one of its members would have benefit from the Women's Act until after the Act becomes operable.  It is well established, however, that traditional finality requirements are disregarded in cases of unreasonable delay.  Air Line Pilots Ass'n., Int'l v. Civil Aeronautics Bd., 750 F. 2d 81, 85 (D.C. Cir. 1984) ("[b]y definition, a claim of unreasonable delay cannot await

final agency action before judicial review, since it is the very lack of agency action which gives

rise to the complaint.")  Here, it is abundantly clear that Congress intended for the defendants to

complete a study for the purpose of identifying WOSBs and to adopt verification procedures, but

the defendants have failed to do either of these things.

The defendants argue that even if it is ultimately determined that the plaintiff's members

qualify as potential beneficiaries of the Women's Act, the Act's implementation "does not

guarantee that the program will be used to award contracts" to those members because "use of

the WOSB[s] contracting program is permissive, and depends heavily on the discretion of the

contracting officer, not on decisions by [the] SBA."  Defs.' Reply at 9.  However, it is not

necessary that the plaintiff prove definitively that any of its members would have been awarded

contracts if the SBA had carried out its obligations prescribed by the Women's Act; rather, "[t]o

show causation and redressability in [a] procedural-rights case, . . . this Court [must] assume[]

the causal relationship between the procedural defect and the final agency action."  Ctr. for Law

and Educ., 396 F.3d at 1160 (citing Lujan, 504 U.S. at 572 n. 7).  The "'plaintiff who alleges a

deprivation of a procedural protection to which [it] is entitled never has to prove that if [it] had

received the procedure the substantive result would have been altered.  All that is necessary is to

show that the procedural step was connected to the substantive result.'"  Nat'l Parks

Conservation Ass'n. v. Mason, 414 F.3d 1, 5 (D.C. Cir. 2005) (quoting Sugar Cane Growers Co-

op. of Fla. v. Veneman, 289 F.3d 89, 94-95 (D.C. Cir. 2002)).  In Center for Law and Education,

the Circuit Court contrasted its decisions where it has conferred standing to organizations whose

"non-lobbying" activities have been impacted by agency action, with those situations where only

"lobbying activities" have been effected and it has refused to confer standing, characterizing the

latter situation as "the type of abstract concern that does not impart standing." Id. at 1161-62

(quoting NTEU, 101 F. 3d at 1429) .  The plaintiff in this case alleges that the defendants' failure

to act has caused the plaintiff's members to suffer both procedural and economic injury.  Pl.'s

Opp'n at 12.  A showing of "concrete harm" is all that is required to afford an opportunity to

enforce its members' procedural rights.  Lujan, 504 U.S. at 573 n. 8.  And all that is necessary is

demonstrating "a causal relationship between the agency [in]action and the alleged injuries."

Ctr. for Law and Educ., 396 F.3d at 1160.  Therefore, it need not be shown that the Women's

Act's implementation would have definitely resulted in contracts being awarded to the plaintiff's

members.  Rather, this Court must only determine whether the SBA failed to comply with its

statutory mandate, and if so, whether there is a substantial probability that the defendants' failure

to comply caused the plaintiff's members to be denied the federal contracts they bid on.  See Fla.

Audubon Soc'y, 94 F.3d at 669.

        To satisfy associational standing (also known as representational standing), the plaintiff

must show "actual or imminent injury to their members caused by the challenged action."  Ctr.

for Law and Educ, 396 F.3d at 1159 n. 1 (citing Warth, 422 U.S. at 511).  The plaintiff alleges

injury-in-fact not only to its members' procedural rights resulting from the defendants' delay, but

also to their economic interests because the plaintiff claims that its members have "los[t]

contracts conducted without the [aid of the] Women's Procurement Program."  Pl.'s Opp'n at 12.

Thus, the plaintiff can be said to allege two types of injury as the representative of its members

"under a Procedural Rights theory of standing": injuries to their members "procedural rights per

se," as well as particularized injuries caused by the SBA's delay.  See Ctr. for Law and Educ.,

396 F.3d at 1159 (organizing the plaintiff's alleged injuries into these two classes of injuries.)

The Court will analyze each of these injuries in turn and then address the causal relationship between the challenged inaction and the alleged injury.

### 1.        Injury to the plaintiff's procedural rights

The plaintiff contends that its members have suffered procedural injury, akin to the injury disappointed bidders on government contracts sustain, and the plaintiff notes that such parties have long had standing to judicially challenge an illegal bidding process.  Pl.'s Opp'n at 14 (citing Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859, 864-65 (D.C. Cir. 1970)).  Indeed, the "disappointed bidder," who has lost opportunities it would otherwise be entitled to pursue, has the right to a procurement process that is legally valid.  See Nat'l Mar. Union of Am. (NMUA) v. Commander, Military Sealift Command, 824 F.2d 1228, 1237 (D.C. Cir. 1987).  Here, the plaintiff alleges that its members' material interests are compromised by the SBA's failure to complete the necessary study and adopt the procedures as required by the Women's Act.  Pl.'s Opp'n at 13.  The Court agrees that the defendants, by failing to complete these obligations, have invaded concrete and particularized procedural rights of the plaintiff's members and have sabotaged, whether intentional or not, the implementation of a procurement program which would have, and will, likely benefit the businesses they represent.

The District of Columbia Circuit has used the hypothetical footnote 7 in Lujan, 504 U.S. at 572 n. 7, as a model for the type of "archetypal procedural injury" that confers standing.  See, e.g., Nat'l Parks Conservation Ass'n, 414 F.3d at 5; Sugar Cane Growers Co-op. of Fla., 289 F.3d at 95.  In that footnote, the Supreme Court explained that "one living adjacent to the site for proposed construction of a federally licensed dam [would have] standing to challenge the licensing agency's failure to prepare an environmental impact statement [as required under 42

U.S.C. § 4332(2)(C)) of the National Environmental Policy Act] even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered." Lujan, 504 U.S. at 572 n. 7.  Thus, to satisfy standing in a case involving procedural rights, a plaintiff must "show that the injury is more than a mere 'general interest [in the alleged procedural violation] common to all members of the public,' [rather] the plaintiff must show that the government act performed without the procedure in question will cause a distinct risk to a particularized interest of the plaintiff." Fla. Audubon Soc'y, 94 F.3d at 664 (quoting Ex Parte Levitt, 302 U.S. 633, 644 (1937)).  "To demonstrate standing, then, a procedural-rights plaintiff must show not only that the defendant's act omitted some procedural requirement, but also that it is substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest." Id. at 664-65.  The plaintiff in this case has alleged that the defendants failed to conduct the study and adopt procedures as required by the Women's Act within a reasonable time and are in violation of the APA.  Compl. ¶ 32 (citing 5 U.S.C. § 555(b)).  This is sufficient to confer standing to the plaintiff to assert this procedural violation because it represents the WOSBs, Id. ¶ 3, and it is substantially probable that the defendants' failure to implement the Women's Act has caused some of these WOSBs concrete injury.

    In Regents of Univ. of Cal. v. Bakke, 438 U.S. 265 (1978) the Supreme Court held that a non-minority medical school applicant who challenged a school's preferential admission program for disadvantaged minority applicants had standing to make the challenge and was not required to show that, but for the preferential program, he would have been admitted into the school. Id. at 280 n. 14.  The lack of opportunity to compete for all of the positions in the entering class, coupled with the desire to do so caused the court to find the existence of standing despite the fact

that Bakke was not a "'disadvantaged' applicant."[18]  Id.  Similarly, in this case, the plaintiff, on

behalf of its members, has alleged the loss of opportunity to qualify for the WOSBs program and

therefore the lost ability to reap the potential benefits intended by Congress' adoption of the

Women's Act.  See Compl. ¶ 3.  Namely, the plaintiff claims that some of its members have

submitted unsuccessful bids on numerous contracts that have been awarded by various federal

agencies.  Pl.'s Opp'n at 2.  This, the Court concludes, is sufficient to demonstrate injury-in-fact.

Since the District of Columbia Circuit issued its ruling in Scanwell Labs., Inc., 424 F.2d at 861,

"[d]isappointed bidders have had standing in this circuit to challenge government procurements."

NMUA, 824 F.2d at 1236-37.  In Scanwell Labs, a plaintiff that alleged that the Federal Aviation

Administration illegally accepted a lower bid was found to have standing because the agency did

not follow the proper "statutory provisions controlling government contracts and the regulations

promulgated thereunder."  424 F.2d at 860-61.  Similarly, in this case, the plaintiff alleges, on

behalf of its members, that the defendants, in failing to act on their mandates imposed by the

Women's Act, have compromised the plaintiff's members' "material interest" to participate in a

procurement process with the benefits of the WOSBs program envisioned by the Women's Act.

Pl.'s Opp'n at 12-13.  "When Congress has laid down guidelines to be followed in carrying out

its mandate in a specific area, there should be some procedure whereby those who are injured by

the arbitrary and capricious actions of a governmental agency or official in ignoring those

procedures can vindicate their very real interests."  Scanwell Labs., Inc., 424 F.2d at 864.  Thus,

the plaintiff alleges something more than an "ingenious academic exercise in the conceivable."

---

[18]  For more cases that support the proposition that the loss of opportunity may constitute injury in fact even if it is not certain that a benefit would be realized if opportunity had been afforded, see 13 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice & Procedure § 3531.4 (2d ed. Supp. 2005).

See Warth, 422 U.S. at 509.  Rather, the plaintiff has established by a preponderance of the evidence that its members have been injured by the SBA's delay and will continue to be injured if the SBA continues to delay the completion of the study and the promulgation of the procedures.  Id.

The defendants attempt to equate the situation here with what the Circuit Court confronted in NMUA.  Defs.' Mem. at 7.  In NMUA, the Circuit Court denied standing to several unions that represented employees of unsuccessful bidders for government contracts who challenged the award of a specific contract to another bidder without the contract containing "a specific wage and benefit determination from the Labor Secretary" as required by the Service Contract Act.  824 F.2d at 1235.[19]  The Court held that the unions' had not "allege[d] a causal connection between the alleged violation of the Service Contract Act and injury to any of their members."  Id. at 1234.  The Court noted that the intended beneficiaries of the Service Contract Act were "private-sector service employees" who would be paid low wages if government contracts were awarded solely on the basis of which employers submitted the lowest bids.  Id. at 1234 (citations omitted).  "To this end, the Act, inter alia, require[d] most government service contracts to . . . 'specif[y]' the minimum wages and fringe benefits contract employees must receive from their private employer . . . ."  Id. 1234-35.  The injuries alleged by the unions in NMUA were limited to allegations that its members lost present or future job opportunities as employees of the losing bidder.  Id at 1235.  The Court noted, however, that "the [Service Contract] Act . . . bestow[ed] no legal right on any employee except those of the winning bidder

_____

[19] The Service Contract Act, among other things, requires, pursuant to 41 U.S.C. § 351(a) (2000), that most government service contracts contain a provision specifying the minimum wages and fringe benefits private employers must pay to their employees as designated by the Secretary of Labor.  Id. at 1234-35.

and no legal duty on private employers or the government except with respect to those employees." Id. Therefore, the Service Contract Act did not grant to the unions "'legal rights, the invasion of which creates standing.'" Id. (quoting Warth, 422 U.S. at 500). In contrast, the Women's Act was passed for the expressed benefit of underrepresented WOSBs and places a duty upon the SBA to complete a study to identify these potential beneficiaries. See 15 U.S.C. § 637(m)(4).

The defendant's reliance on NMUA is also misplaced because the plaintiff in this case claims procedural injury, Pl.'s Opp'n at 14, which the court in NMUA acknowledges can provide an independent basis for standing. NMUA, 824 F.2d at 1237. In NMUA, the court specifically explained why its ruling would not impact disappointed bidders' standing, noting that a disappointed bidder claiming "illegality in a procurement alleges an injury beyond its economic loss of the contract [because] [t]he disappointed bidder may also claim injury to its right to a legally valid procurement process." Id. (citations omitted). But the court also noted that in NMUA there was "not even an indication" that the bidding employer (Marine Transport) would rebid on the lost contract should there be a "second round of bidding." Id. at 1236. Therefore, the Court concluded that the purported injury was "causally speculative," id. (citations omitted), as it was not "fairly traceable to the putatively illegal omission of a wage determination from the contract nor [was it] fairly redressable by the remedy the Unions [sought]." Id. at 1235.

Unlike the employer in NMUA, where there was "not even an indication that Marine Transport [, the employer,] would even be willing to re-bid" if the opportunity to bid was provided anew, id. 1236, the Women's Chamber of Commerce represents "small business members [who] have contracted, and continue to seek contracts, with virtually all federal

agencies."  Compl. ¶ 3 (emphasis added).  In contrast to the employer in <u>NMUA</u>, the "implicit

assurance to this court that [the Women's Chamber of Commerce's members] 'stand[] ready,

willing and able' to [bid] . . . indicates that exercise of the judicial remedial power w[ill] not be

in vain."  <u>Id.</u> at 1237 (quoting <u>Orange Park Fla. T.V., Inc. v. FCC</u>, 811 F.2d 664, 672 & n.18

(D.C. Cir. 1987) (assurance of license applicant's intent to reapply contributes to satisfaction of

causation requirement)).

**2.      Injuries to the plaintiff's particularized interests caused by the delay**

In addition to asserting procedural rights injury, the plaintiff claims to represent members

of its organization that have suffered "unrecouped bid preparation costs as well as lost business

revenue and business opportunities . . . [, along with] diminished and lost relationships with

government agencies."  Pl.'s Opp'n at 12.  The District of Columbia Circuit has held that

disappointed bidders who have suffered economic loss as a result of an illegal procurement

process have the right to recoup their losses.  <u>NMUA</u>, 824 F.2d at 1237 (citations omitted).  The

plaintiff, however, does not seek monetary relief and, as previously stated, only requests "[a]n

order pursuant to 5 U.S.C. § 706, or alternatively, a writ of mandamus pursuant to 28 U.S.C. §

1651(a)," compelling the defendants to comply with the obligations imposed by the Women's

Act.  <u>See</u> Compl. at 11.  And a plaintiff can request mandamus or other relief "less intrusive than

mandamus"[20] in a case of unreasonable delay.  <u>See</u> <u>Muwekma Tribe</u>, 133 F. Supp. 2d at 30.

---

[20]  "'Mandamus provides appropriate relief under the All Writs Act, but court have generally been unwilling to use the writ in this context.  Instead, courts have fashioned equitable remedies under [42 U.S.C.] section 706(1).'"  <u>Muwekma Tribe v. Babbitt</u>, 133 F. Supp. 2d at 30, 41 n. 11 (D.D.C. 2000) (quoting Carol R. Miaskoff, Note, <u>Judicial Review of Agency Delay and Inaction Under Section 706(1) of the Administrative Procedure Act</u>, 55 Geo. Wash. L. Rev. 635, 656 (1987)) (citations omitted).

-24-

Thus, because the present case involves concrete injury which has harmed and continues to harm the plaintiff's members it is entitled to some form of relief.[21]

In Sugar Cane Growers Co-op, the District of Columbia Circuit found that the plaintiffs, a consortium of sugar cane growers, processors, refiners, and marketers, 289 F. 3d at 91, had established concrete injury by alleging that the defendant agency had, inter alia, "promulgate[d] a rule without notice-and-comment rulemaking" in violation of the APA.  Id. at 93.[22]  The Court found that the plaintiffs had "made a prima facie showing that the [agency payment] program caused them injury by increasing the supply of U.S. sugar," id at 94, which "had a depressive effect on sugar prices . . . ," id. at 93.  Similarly, the plaintiff in this procedural rights case claims that its members have suffered economic injury, namely, "lost contracts[,] . . . unrecouped bid preparation costs[,] . . . [and] diminished and lost relationships with government agencies[,]" resulting from the defendants' failure to timely comply with their congressionally mandated obligations.  Pl.'s Opp'n at 12.  This, the Court concludes, is sufficient injury for standing purposes.

### 3.    Causal relationship between the inaction and the injury

Regardless of whether the injury is procedural or substantive, to have standing to assert these alleged injuries the plaintiff "must show 'a causal connection between the injury

---

[21]   The defendants assert that it is not presently known "what effect, if any, a 'targeted program' will have on the amount of federal contracting with WOSB[s]."  Defs.' Reply at 10.  However, it is not disputed that the purpose of the program is to afford women controlled businesses greater opportunities to acquire federal contracts.  Defs.' Mem. at 2.  Having failed to afford this opportunity to the plaintiff's members for almost five years through their inaction, relief of some kind is in order.

[22]   The payment program at issue provided government purchased sugar to sugar beet farmers who "offer[ed] to destroy (or 'divert') a certain amount of their crops in return for the government sugar," which the plaintiff alleged "unfairly provided participants [with] below-harvest-cost government sugar which gave them a competitive advantage over [the plaintiffs]."  Sugar Cane Growers Co-op, 289 F.3d at 92.

complained of – the injury has to be fairly . . . trace[able] to the challenged action of the

defendant, and not . . . th[e] result [of] the independent action of some third party not before the

court.'" Ctr. for Law and Educ., 396 F.3d at 1160 (alteration in original) (quoting Lujan, 504

U.S. at 560-61).  However, "[t]he procedural-substantive distinction may still seem to be

important because '[p]rocedural rights are special': The person who has been accorded a

procedural right to protect his concrete interests can assert that right without meeting all the

normal standards for redressability and immediacy.'" Nat'l Parks Conservation Ass'n., 414 F.3d

at 5 (quoting Lujan, 504 U.S. at 572 n. 7).  Nonetheless, there must still be a "causal connection

between the challenged agency action . . . and the alleged injury." Ctr. for Law and Educ., 396

F.3d at 1160.  The defendants believe that "the causal chain here, as in Center for Law and

Education, is too attenuated to grant [the] plaintiff associational standing based on the claimed

injury to [the] plaintiff's members."  Defs.' Reply at 11.

   In Center for Law and Education, the Circuit Court held that individual and

organizational plaintiffs failed to show that "alleged procedural violations caused actual injury to

[the plaintiffs'] concrete interests such that they satisfy Article III's requirement of standing."

396 F.3d at 1160.  With respect to the individual plaintiff, the Court noted that "the agency action

and the alleged injury [stood] at opposite ends of a long chain." Id.  The Court then outlined "the

alleged causal chain . . . between the beginning and end of the purported chain . . . [and agreed

with the defendants' position that the causal chain was too] attenuated [to support a] hold[ing]

[that] the alleged injury [was] 'fairly traceable to' the final agency [action] 'and not the result of

the independent action' [of a third party]." Id. at 1161 (quoting Lujan, 504 U.S. at 560).

Specifically, the first step of the purported causal chain required the defendant to "promulgate[]

final rules giving discretion to the States to implement their own rules" and the second step required "the State of Illinois, in its discretion, [to] implement rules that were permitted but not required by [the defendant]." Id. at 1160.[23]  In contrast, the plaintiff here challenges inaction in the performance of obligations required by the Women's Act.[24]  In addition, the plaintiff is not challenging the defendants' failure to implement the Act as suggested by the defendants, but rather challenges the defendants' failure to complete the study and promulgate the procedures mandated by Congress, prerequisites to the Act's implementation.[25]  A causal relationship between the defendants' failure to act and the plaintiff's members' alleged injuries is therefore readily apparent.

Having seemingly assumed that the plaintiffs in National Parks Conservation Association, sustained procedural injury, 414 F.3d at 4-5, but concluding that determining whether the injury was procedural or substantive in nature was unnecessary, the Circuit Court noted that "the question of standing . . . turn[ed] on the strength of the link between [the agency's action and the alleged injury]." Id. at 5.  The Circuit Court found standing even though the "ultimate source of injury [was] two steps removed from the alleged procedural defect." Id. at 5. The Court reasoned that all the plaintiff was required to show was "[a] 'substantial probability' that [the agency's] action 'created a demonstrative risk, or caused a demonstrable increase in an existing risk, of injury to the particularized interests of' [the plaintiff] . . . ." Id. (quoting Fla.

---

[23] The three additional links in the chain separating the agency action from the alleged injury were: "(3) [the] rules increased the risk of improper evaluation of students and school; (4) [the plaintiff's] daughter's school might be improperly classified as a result . . . [and] (5) [the plaintiff's] daughter might thereby be harmed by improper classification." Id. at 1160-61.

[24] See 15 U.S.C. § 637(m)(4) and § 637(m)(5)(A) and the discussion of these provisions infra, pp. 33-34.

[25] See infra n. 26.

Audubon Soc'y, 94 F.3d at 669).  And because the federal agency "exert[ed] legal authority"

over the State, the State was "not the sort of truly independent actor who could destroy the

causation required for standing."  Id. at 6.  Thus, to the extent that the defendants here are

claiming that the delay "is due in part to the National Academy of Sciences's contracting process

and internal research activities," and this destroys the causal link, this Court finds that the NAS is

not the type of "independent actor whose intervening action breaks the causal chain."  Def.'s

Reply at 9.  Indeed, it was the defendants' choice to contract with the NAS, Def.'s Mem. at 12,

and in any event, the NAS has now completed its analysis.  Defs.' Notice of Report at 1.

Having found that there is substantial probability that at least some of the plaintiff's

members would have qualified as entities the Women's Act was intended to benefit, and that the

chain of causation is not so attenuated between the defendants' inaction and the injuries sustained

by those members, this Court concludes that the plaintiff has standing to pursue this action.

## C.    The Small Business Act's "No-Injunction" Provision

The plaintiff does not dispute that the relief it is seeking, if granted, would have the same

impact as an injunction.  Pl.'s Opp'n at 17.  The complaint requests that this Court compel the

defendants, within three months, to "complete a final study to identify industries [involved in the

federal procurement process] in which WOSBs are underrepresented . . . and . . . establish

procedures to verify eligibility in the program."  Compl. at 11.[26]  However, the issuance of

injunctive relief against the defendants is not barred by the "no-injunction" provision of 15

---

[26]    Contrary to defendants' assertions, the plaintiff is not requesting that this Court compel the defendants to
implement the WOSBs contracting program, Defs.' Mem. at 9, but rather that the defendants be compelled to
comply with their statutory obligation to publish a study and establish procedures so that qualified WOSBs can be
identified, which are prerequisites to the Act's implementation.  See 15 U.S.C. § 637(m)(2)(C).

U.S.C. § 634(b)(1), if the Administrator acted outside the scope of his authority.  See Kleppe,

506 F.2d at 245; DRG Funding Corp. v. Sec'y. of Housing and Urban Dev., No. 88-2202, 1988

WL 90107, *3 (D.D.C. 1988) (concluding that the plaintiff could pursue its claim because the

decision in Kleppe "appeared to indicate that . . . anti-injunctive provisions do not apply when

the agency has acted outside of its statutory authority"); see also Ricks v. United States, 434 F.

Supp. 1262, 1272 (D.C. Ga. 1976) (noting the decision in Kleppe and stating that it would be "a

harsh construction to interpret [§ 634(b)(1)] literally with the result that it deprive[d] [the

plaintiff] of his only effective remedy (an injunction).")

The plaintiff asserts that the defendants' more than four years and ten month delay in

completing their obligations imposed by Congress in the Women's Act is unreasonable and

merits judicial intervention under the APA.[27]  Compl. ¶ 32; Pl.'s Opp'n at 17-19 (citing 5 U.S.C.

§ 555(b)).  Indeed, "egregious procedural errors" in violation of the APA are sufficient to defeat

the anti-injunction provision of the Small Business Act.  Okla. Aerotronics v. United States, 661

F.2d 976, 977 (D.C. Cir. 1981).  And the APA mandates that agencies act "within a reasonable

time." 5 U.S.C. 555(b).  In order to determine if the defendants have acted beyond their authority,

and thus, whether this Court has jurisdiction to entertain this case, it is necessary that this Court

only examine the facts to determine if the delay is sufficiently unreasonable to defeat the anti-

---

[27] The plaintiff also claims that the defendants exceeded their authority by flagrantly disregarding the statutory mandate under the Act, which is illustrated by the Administrator's purported statement that he has "no intention of implementing the WOSB[s] program,"and indicated "the goals in the Act are meaningless and that the agency would suffer no consequences if it failed to meet the goals."  Pl.'s Opp'n at 22; see also Dorfman Decl. ¶  7. Indeed, if in fact the defendants have wilfully disregarded their obligations under the Act, "deciding instead to delay indefinitely any [action], this would be a straightforward case of unreasonable delay."  Bluewater Network, 234 F.3d 1305, 1308 (D.C. Cir. 2000).  As noted already, the defendants dispute the plaintiff's characterization of the Administrator's statements.  Defs.' Mem. at 12.  The plaintiff asserts that to "resolve contested facts regarding the Administrator's pronouncements in order to decide the jurisdictional issue, [the Court] should defer its jurisdictional decision until it decides the merits of the case."  Pl.'s Opp'n at 7.  However, because this Court concludes that the delay has been unreasonable, it does not need to make this credibility determination.

injunction provision of the Small Business Act.  See Okla. Aerotronics, 661 F.2d at 977 (stating

that under the APA, "[a]ppellee[] SBA's arguments about sovereign immunity and injunctive

relief are irrelevant [because] [t]his court may hold unlawful and set aside agency action that is

. . . 'not in accordance with law.'" (citing 5 U.S.C. § 706(2)(A)).  "When the defendant . . .

challenge[s] the factual basis of the court's jurisdiction, the court may not deny the motion to

dismiss merely by assuming the truth of the facts alleged."  Phoenix Consulting Inc., 216 F.3d at

40.  Rather, when the facts are in dispute in a motion to dismiss for lack of jurisdiction, it is

sometimes appropriate for the Court to "go beyond the pleadings and resolve disputed issues of

fact the resolution of which is necessary to a ruling."  Id.  Such is the case here, where the

underlying factual dispute turns on whether or not the delay is unreasonable.  In International

Chemical Workers Union, the District of Columbia Circuit Court stated that "in extraordinary

circumstances, th[e] court will review claims of unreasonable agency delay, for '[i]t is obvious

that the benefits of agency expertise and creation of a record will not be realized if the agency

never takes action.'"  958 F.2d 1144, 1149 (D.C. Cir. 1992) (quoting Telecomm. Research and

Action Ctr. (TRAC) v. FCC, 750 F.2d 70, 79 (D.C. Cir. 1984)).  To warrant a grant of mandamus

relief for agency delay, the Court must consider the "hexagonal contours of [the] standard"

delineated by District of Columbia Circuit in TRAC, 750 F.2d at 79-80.[28]  As the TRAC Court

noted, the standard "is hardly ironclad" and "sometimes suffers from vagueness, it nevertheless

provides useful guidance in assessing claims of agency delay . . . ."  Id. at 80.  The six factors

---

[28] In this case, the plaintiff requests a writ of mandamus and an "order retaining the Court's jurisdiction over the case until the SBA has completed its Congressional mandates . . . ."  Compl. at 11.  The parties do not dispute that the test set forth in TRAC is the correct standard to apply in this case. Defs' Mem at 13-14; Pl.'s Opp. 19-20 & n.20; see also, St. Lawrence Seaway Pilots' Ass'n. v. Collins, 362 F. Supp. 2d 59, 67 n.10 (D.D.C. 2005) (applying TRAC to a case requesting mandatory injunctive relief because the relief sought is "in the nature of a mandamus compelling [agency action]"), vacated as moot in No. 03-1204, 2005 WL 1138916 (D.D.C. 2005).

extracted from District of Columbia Circuit precedent by the <u>TRAC</u> court compose the standard.

They are the following:

> (1) the time agencies take to make decisions must be governed by the rule of reason . . . ; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason . . . ; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when  human health and welfare are at stake . . . ; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority . . . ; (5) the court should also take into account the nature and extent of the interests prejudiced by the delay . . . ; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed . . . .

<u>Id.</u> at 80 (citations and internal quotation marks omitted).

The first component of the <u>TRAC</u> standard calls for this Court to "consider the agency's justification for the pace of its decision." <u>Muwekma Tribe</u>, 133 F. Supp. 2d. at 36 (citation omitted).  Although "[t]here 'is no <u>per se</u> rule as to how long is too long' to wait for agency action, . . . a reasonable time for agency action is typically counted in weeks or months, not years." <u>Am. Rivers and Idaho Rivers United</u>, 372 F.3d 413, 419 (D.C. Cir. 2004) (quoting <u>Int'l Chem. Workers Union</u>, 958 F. 2d at 1149) (citing <u>Midwest Gas Users Ass'n. v. FERC</u>, 833 F.2d 341, 359 (D.C. Cir. 1987)).  Thus, the Court in <u>American Rivers</u> held that the Federal Energy Regulatory Commission's six-year delay in responding to environmental organizations' petition to formally consult with environmental agencies regarding the effect of hydropower operations on a "threatened and endangered" fish species was "nothing less than egregious." <u>Id.</u> at 413, 419. Somewhat similar to the situation in <u>American Rivers</u>, where the agency "vacillate[d] between claiming that it [was] not obligated to respond to the . . . petition and assert[ed] it can do no

more," id., the defendants in this case assert on the one hand that there is no deadline for completion of the study and procedures, while on the other hand proclaim that completion of the study is extremely difficult. Defs.' Mem. at 16-17. On the latter point, the defendants indicate that it is difficult to measure "underrepresentation" of WOSBs "in industries and regions" of the country, and also noted that "'disparity studies' . . . have frequently been challenged and found insufficient by federal courts to justify preferential treatment of certain businesses based on race and gender." Id. at 17 (citations of cases where disparity studies have been challenged omitted). Further, the defendants argue that the NAS report verifies that "'it is no easy matter to produce valid estimates of disparities.'" Defs.' Notice of Report at 2 (quoting NAS Report, Executive Summary, Chapter 2 at p. 2-8).

Although in some cases administrative delays may be unavoidable, "extensive or repeated delays are unacceptable and will not justify the pace of action." Muwekma Tribe, 133 F. Supp. 2d. at 36 (citing MCI v. FCC, 627 F.2d 322 (D.C. Cir. 1980)). The District of Columbia Circuit has "directed [this] court [in delay challenge cases] to 'ascertain the length of time that has elapsed since the agency came under a duty to act.'" Id. at 37 (citing Cutler v. Hayes, 818 F.2d 879, 897 (D.C. Cir. 1987)). Here, on December 21, 2000, Congress, through the adoption of the Women's Act, gave the SBA a mandate to act. See Pub. L. No. 106-554 §1(a)(9). Over four years and ten months have now elapsed since the congressional mandate was imposed. Although the Administrator has stated that he has every intention of fulfilling the SBA's obligations, Barreto Decl. ¶ 5, the SBA has not yet accepted a new proposal to conduct the WOSBs study. McCullough Decl. ¶ 5. The SBA status report, Defs.' Status Rept., suggests circumstances similar to Muwekma Tribe, "where [the] plaintiff's petition for federal recognition had been

pending for at least four years and there is no clear end in sight."  133 F. Supp. 2d. at 36 (citation

omitted).  Likewise, over four years have elapsed since the Women's Act was enacted and still it

remains unclear when the study and procedures will be completed so that the Act can be

implemented.  Thus, the first TRAC factor weighs heavily in favor of a finding of unreasonable

delay.

Regarding the second TRAC factor, the defendants argue that there is no "guarantee that

the [WOSBs contracting] program will be used to award contracts" because even when the

Women's Act is implemented, the award of contracts to WOSBs will be "permissive, not

mandatory, [as the Act] depends heavily on the discretion of the contracting officer, not on

decisions by the SBA."  Defs.' Reply at 9.  Admittedly, implementation of the provision of the

Women's Act, which permits a contracting officer to restrict competition, is discretionary if

specified facts are satisfied.  15 U.S.C. § 637(m)(2).  However, § 647(m)(4) of the Act provides

that "[t]he administrator shall conduct a study to identify [WOSBs] industries," 15 U.S.C. §

637(m)(4) (emphasis added), and § 637(m)(5)(A) states that "[i]n carrying out this subsection

[(subsection (m))], the Administrator shall establish procedures . . . ."  15 U.S.C. § 637(m)(5)(A)

(emphasis added).[29]  And the plaintiff contends that the amount of time the defendants have taken

---

[29]  Section 637(m)(5)(A) provides in its entirety that following:
    (5) Enforcement; penalties
     (A) Verification of eligibility
      In carrying out this subsection, the Administrator shall establish
    procedures relating to –
       (I) the filing, investigation, and disposition by the Administration of any challenge to
      the eligibility of a small business concern to receive assistance under this subsection
      (including a challenge, filed by an interested party, relating to the veracity of a
      certification made or information provided to the Administration by a small business
      concern under paragraph (2)(F)); and  (ii) verification by the Administrator of the
      accuracy of any certification made or information provided to the Administration by a
      small business concern under paragraph (2)(F).
     (B) Examinations

(continued...)

to comply with these mandatory obligations has been unreasonable.  Pl.'s Opp'n at 19.  On the

other hand, the defendants assert "that Congress has acquiesced [to] the careful and measured

steps the Administrator is taking" in fulfilling his obligations by "choos[ing] not to impose any

deadline on [the] SBA or mak[ing] the WOSB[s] contracting program self-executing."  Defs.'

Reply at 13 (citation omitted).  However, the Circuit Court rejected a similar argument in

Mashpee Wampanoag Tribal Council, Inc. v. Norton, 336 F.3d 1094 (D.C. Cir. 2003).  In

Mashpee, the Secretary of the Department of the Interior argued that because there was no

"mandatory, nondiscretionary duty" requiring agency action, the district court "lacked

jurisdiction" to require the agency to act.  Id. at 1099.  In rejecting that argument, the Court

concluded that the plaintiff's APA unreasonable delay claim did not have to be grounded on a

"mandatory" duty to act because the APA itself authorizes review of agency action that is

unreasonably delayed.  Id. at 1099-1100.  To the extent that the defendants are suggesting

otherwise, this Court does not agree that Congress intended to afford the defendants the authority

to delay the completion of the study and the adoption of procedures indefinitely.  See Muwekma

Tribe, 133 F. Supp. 2d at 39 (stating that "notwithstanding the defendants' arguments . . .

Congress [did not] intend[] petitions to languish in the review process indefinitely").  Moreover,

---

[29](...continued)

      The procedures established under subparagraph (A) may provide for program
      examinations (including random program examinations) by the Administrator of any
small      business concern making a certification or providing information to the
Administrator      under paragraph (2)(F).
  (C) Penalties
    In addition to the penalties described in section 645(d) of this title, any small business
concern that is determined by the Administrator to have misrepresented the status of that
concern as a small business concern owned and controlled by women for purposes of this
subsection, shall be subject to–
      (I) section 1001 of Title 18; and
      (ii) sections 3729 through 3733 of Title 31.

the plaintiff notes that members of both the House of Representatives and the Senate have

expressed dissatisfaction with the SBA's delay in completing its obligations under the Act, and

legislation has been introduced "to make the program self-executing."  Compl. ¶ 22; cf. Collins,

362 F. Supp. 2d at 71 (noting that neither party submitted any evidence that Congress has been

dissatisfied with the agency's actions).  Thus, the circumstances in this case cause the Court to

conclude that the second TRAC factor weighs in favor of a finding of unreasonable delay.

Courts have considered the third and fifth TRAC factors collectively because they focus on

similar considerations.  Muwekma Tribe, 133 F. Supp. 2d at 39; see also, Collins, 362 F. Supp.

2d at 73.  Namely, these two factors require the Court to evaluate the nature of the interests

involved and instruct courts to consider whether economic, as compared to human health and

welfare, are at stake and to afford delays involving matters falling in the latter categories "less

tolerable."  TRAC, 750 F. 2d at 80.  The defendants argue that the plaintiff's "interests at stake"

are purely economic.  Defs.' Mem. at 16.  The Court agrees.  As the representative of WOSBs

that have been "historically underrepresented" in the federal contracting procurement process, the

plaintiff's mission is the acquisition of federal contracts for its members and the associated

economic benefits derived from those acquisitions.  Compl. ¶¶ 10-11.  Being purely economic in

nature, delay impacting these interests is therefore entitled to greater indulgence.  See TRAC,

242 U.S. at 80.  The fact that the interests the plaintiff seek to advance are purely economic,

however, does not diminish other indications that the defendants' delay is unreasonable, nor does

it preclude a finding of unreasonable delay under the APA.

     The fourth TRAC factor requires the Court to consider the impact expediting delayed

action will have on other agency activities of a "higher or competing priority."  TRAC, 750 F. 2d

at 80.  The record does not reveal any higher priorities or competing interests that will be compromised if the SBA gives expedited attention to completing the obligations imposed by the Women's Act.  Although it may be true that the defendants' other WOSBs programs may "render the delay [here] . . . more tolerable under the rule of reason," Defs.' Reply at 16, this does not override the congressional mandate given to the SBA.  The Court is not unsympathetic to the defendants' claims that other industries may be injured by implementing the WOSBs program based on a defective industry study, id. at 16-17, that Congress has entrusted the SBA to produce a reliable study, and that "judicial imposition of an overly hasty timetable for implementation of the federal WOSB[s] contracting program . . . would be contrary to the [interests] of all parties who will be affected and contrary to the public interest."  Defs.' Reply at 15-16.  Nevertheless, this Court is compelled to conclude that the almost five year delay, based on the record in this case, is unreasonable.  Therefore, the fourth TRAC factor also weighs in favor of finding unreasonable delay.

When all of the TRAC factors are considered collectively, this Court is compelled to conclude that the delay in this case is unreasonable.  Thus, the defendants have acted outside the scope of their authority by enabling the delay, and this action is therefore not barred by the no-injunction provision of 15 U.S.C. § 634(b)(1).

### V.  Conclusion and Remedy

The record in its entirety causes the Court to conclude that the plaintiff has associational standing to pursue this action for unreasonable delay under APA § 706(1) on behalf of its membership.  Because its members have been required to pursue their efforts to secure federal procurement contracts without the potential benefit envisioned by the Women's Act due to the

defendants' delay in completing their responsibilities compelled by § 637(m) of the Women's

Act, 15 U.S.C. § 637(m), the plaintiff has Article III standing to maintain this action on their

behalf.  And because the defendants' almost five year delay is unreasonable, their claim that this

suit is barred by 15 U.S.C. § 634(b)(1) is unavailing since the delay is beyond the scope of the

SBA and its Administrator's authority.

However, because the defendants assert that they have now re-drafted proposed

regulations and are actively searching for proposals to conduct the study, McCullough Decl. ¶¶ 3-

5, this Court will not impose injunctive relief at this time.  And, in keeping with this Circuit's

precedent, rather than requiring a specific date for completion of the defendants' obligations, this

Court will retain jurisdiction in this case and monitor the defendants' adherence to their

congressional mandates.  See, e.g., TRAC, 750 F.2d at 80 (holding that delay did not warrant

mandamus but was "serious enough for [the Court] to retain jurisdiction over this case until final

agency disposition);  Air Line Pilots Ass'n Int'l, 750 F.2d at 88-89 (finding unreasonable delay

and mandating that the agency give periodic accounting of its progress every thirty days);

Muwekma Tribe, 133 F. Supp. 2d at 41 (determining that defendants' extensive delay was

"unjustified and without good reason" and requiring defendants to submit a proposed schedule

for completion of its responsibilities).  This Court therefore adopts the remedy imposed in

Muwekma Tribe, and accordingly concludes that a "deadline is in order and the agency is

directed to propose one consistent with this opinion and . . . § 706(1) [of the APA]."  133 F.

Supp. 2d at 41.  The proposed schedule shall be submitted to the Court within 45 days of the

issuance of this opinion, and a status hearing will thereafter be scheduled by the Court.

For the foregoing reasons, this Court denies the defendants' motion to dismiss.

**SO ORDERED** on this 30th day of November, 2005.

REGGIE B. WALTON
United States District Court Judge